**UNITED STATES of America, Plaintiff-Appellee,**

v.

**William Calvin WOODS, Defendant-Appellant.**

**No. 76–4179.**

United States Court of Appeals, Fifth Circuit.

Oct. 7, 1977.

Rehearing Denied Nov. 3, 1977.

Doyle F. Chaney (Court-Appointed), Fred Blanton, Birmingham, Ala., for defendant-appellant.

J. R. Brooks, U. S. Atty., Shirley I. McCarty, Asst. U. S. Atty., Birmingham, Ala., for plaintiff-appellee.

Before GOLDBERG and FAY, Circuit Judges, and DUMBAULD, District Judge.*

FAY, Circuit Judge:

A jury found appellant, William Calvin Woods, guilty of possessing an unregistered shotgun in violation of 26 U.S.C. § 5861(d).[1] Prior to the commencement of the trial, appellant filed a motion to suppress as evidence the shotgun described in the indictment. The denial of that motion, based on the "plain view" doctrine, inspired this appeal. We affirm.

## THE FACTS

The testimony offered by the government at the suppression hearing reveals that at 8:30 one morning two county sheriff's deputies went to appellant's residence to execute an arrest warrant for Calvin Marshall, an alias used by appellant.[2] One officer knocked on the door of the residence, but no one answered. As the officer knocked a second time, the door sprang open. Both officers then entered the residence, announced themselves, and started looking for Mr. Marshall when Brenda Jones, appellant's roommate, came out from the back of the house.[3] The officers asked to see Marshall and Ms. Jones led them to the back bedroom and then the bathroom. Not finding Marshall in either place, the officers began looking for him in the other rooms. Upon entering a room between the kitchen and the living room, one officer observed three to four inches of a shotgun barrel protruding out from under the front of a cabinet. He bent down to retrieve the bar-

rel and, as he rose up, he observed the stock to the gun on the top shelf of the cabinet, the doors of which were open. After calling for a detective who arrived shortly thereafter, the officers left the residence, leaving the detective there with the shotgun. The officers and Brenda Jones went to a bakery where appellant supposedly worked but they did not find him. They returned to the residence and seized the shotgun.

Appellant's version of the facts varies slightly with the government's version stated above. Outside the presence of the jury, Brenda Jones testified that she was in the bathroom when the officers knocked but said nothing, and when she peeped out from the bedroom, they told her to come out. They asked for Calvin and told her to open the back bedroom door. They looked through the house, including behind a cabinet in the dining room. Finding what looked like a pipe, the officer pulled the cabinet away from the wall, opened the cabinet doors and looked inside, finding the stock to the shotgun.

## THE ISSUES

In response to the government's contention that the officers were properly in the house and their seizure of the shotgun proper under the "plain view" doctrine, appellant contends that the officers' entry into the house was not with any consent of the occupant and thus the officers did not have a right to be where they were; that there was no accompanying arrest to justify the search of the house;[4] that the plain view

---

* District Judge of the Western District of Pennsylvania, sitting by designation.

1. The indictment actually charged three people, Cedric Marshall, Charles Bethune, and appellant, with aiding and abetting each other in the knowing possession of a single barrel, sawed-off shotgun with a barrel length of less than 18 inches, which had not been registered to them. During the trial, the court granted a motion of acquittal as to Charles Bethune. The jury returned a verdict of not guilty as to Cedric Marshall.

2. The county police officers were attempting to execute a state-issued arrest warrant charging

appellant with assault and battery of one Bernice Thomas. The circumstances surrounding the arrest warrant are irrelevant to the instant case, except the fact that executing this arrest warrant was the officers' purpose in going to appellant's residence on that morning they found the unregistered gun.

3. The record is unclear as to whether Brenda Jones was the wife of appellant, but it is clear that she lived in the same house.

4. The officers never did find appellant that day, and it was not until three months later that he was found and arrested.

doctrine is not applicable since the barrel observed by the officer was not in fact or appearance a shotgun; and that no exigent circumstances existed to excuse the officers from obtaining a search warrant.

After conducting a hearing, the trial court denied appellant's motion to suppress, stating:

> The motion to suppress is denied. Officer Thomas' testimony was affirmative with respect to the open view. At most there is some minor contradiction by this witness of that and in no respect a direct denial that it could have been seen protruding, that is, the barrel part from the lower part of the cabinet. The fact that there is a dispute over whether the doors to the cabinet where the receiver portion [was] were open or not, the Court does not view to be credible to the issue. I could accept, for example, the witness' description of the door being closed, but once the barrel end was seen in open view, then the testimony given by Officer Thomas and by this witness would justify in the Court's opinion the opening of the door itself for the other portion of that weapon.

## DISCUSSION

If the shotgun fell within the plain view of the officers and if they had a right to be where they were when they had that view, then the shotgun was subject to seizure and properly introduced into evidence. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971);[5] *Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).[6]

5. In *Coolidge*, the Supreme Court observed: What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. 403 U.S. at 466, 91 S.Ct. at 2038.

6. In *Harris*, after the arresting officer, without a warrant, searched the impounded vehicle and tied a property tag on it, as required by a police department regulation, he then proceeded to close the windows and lock the doors in order to protect the car and its contents. As he opened the door on the passenger side in order to secure the door and window on that side, he saw in plain view the automobile registration

■ Although the facts related by the officers differ from the facts described by appellant's witness, Brenda Jones, credibility choices and the resolution of conflicting testimony are within the province of the finder of fact, in this instance, the court, subject only to the clearly erroneous rule. *Hodgson v. H. Morgan Daniel Seafoods, Inc.*, 433 F.2d 918, 920 (5th Cir. 1970). Similarly, the trial court's finding of fact on a motion to suppress must be accepted unless clearly erroneous. *United States v. Griffin*, 555 F.2d 1323, 1324 (5th Cir. 1977); *United States v. James*, 528 F.2d 999, 1018 (5th Cir. 1976), *cert. denied, Henry v. United States*, 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976); *United States v. Horton*, 488 F.2d 374, 380 (5th Cir. 1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974); *United States v. Gunn*, 428 F.2d 1057, 1060 (5th Cir. 1970). *See also* 3 Wright, Federal Practice and Procedure § 675, at 130 (1969). The trial judge found, after hearing evidence on the motion to suppress, that at least the barrel part of the gun was in the officer's open or plain view. After reviewing the record, we are unable to say that this finding is clearly erroneous. "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Thus the finding that the shotgun was in plain view shall not be disturbed.

card belonging to the robbery victim. The officer returned to the station, brought the defendant to the car, and confronted the defendant with the registration card. The defendant disclaimed any knowledge of the card. The officer then seized the card and brought it into the station. Despite the defendant's contention on appeal that the card was the result of an illegal seizure, the Supreme Court affirmed the defendant's conviction, stating: "It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence". 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067.

There is some discussion in the record and on appeal regarding the officer's recognition of the shotgun barrel as a shotgun barrel. Appellant contends that it was not "immediately apparent" (referring to *Coolidge, supra,* 403 U.S. at 466, 91 S.Ct. at 2038, and *United States v. Drew,* 451 F.2d 230, 233 (5th Cir. 1971)) that the observed object was contraband, that it could just as easily have been a pipe, and that the barrel by itself was not a shotgun. The officer testified that he saw the barrel of a gun protruding out from under the front of the small cabinet, the cabinet having some drawers and shelves and being approximately three to four feet in height with twelve inch legs. On cross-examination, the witness conceded that the barrel could have been mistaken for a pipe and that he determined it was a sawed-off shotgun by pulling it out from under the cabinet.

The record reflects that the barrel portion of the gun found under the cabinet measured 14¼ inches with the total length of the gun measuring 17¼ inches. Chapter 53, Title 26, U.S.C., prohibits the possession of any unregistered shotgun with a barrel of less than 18 inches and an overall length of less than 26 inches. Id., §§ 5845 and 5861. Perhaps if the cabinet had been extraordinarily deep (measuring front to back since the barrel was seen protruding out from the front), it might be more difficult if not impossible to know for sure that the observed barrel was less than the legally permissible minimum length. However, there is no evidence in the record to suggest that this problem is present in the instant case.

The appellant in *United States v. Cecil,* 457 F.2d 1178 (8th Cir. 1972), raised a similar argument when challenging the denial of his motion to suppress a sawed-off shotgun seized in plain view. In response to the appellant's contention that the officers could not seize his gun without knowing for certain that it was unregistered and too short, the court observed:

Defendant argues that nonregistration is an essential ingredient of the offense of possession of a sawed-off shotgun and that without knowledge of nonregistration the officers could not lawfully seize the gun and arrest the defendant. The argument is specious. Without knowing the serial number of the gun the officers could not check registration, and without measuring it they could not determine its length. Two officers testified that the gun appeared to be a sawed-off shotgun. Subsequent investigation revealed that the gun was within the class defined by 26 U.S.C. § 5845(a) and was not registered.

The observation of the gun gave probable cause for the reasonable belief that a crime, the possession of a contraband firearm, was being committed in the presence of the officers. . . . We know of no rule which requires an officer to have knowledge of all the elements of the crime when he views an article which reasonably appears to be contraband. A requirement that an officer must know the fact of nonregistration before seizing a contraband firearm would stultify the enforcement of the National Firearms Act. We are convinced that the trial court properly denied the motion to suppress and properly received the gun in evidence. 457 F.2d 1178, 1180–81.

Simply because the officer in the instant case stated that the barrel "could have been mistaken" as a pipe doesn't mean that he mistook it as such. Based on his experience and knowledge he thought when he first saw it that the protruding object was a shotgun barrel, of less than the required length, and indeed it was just that when he pulled it out. There is no evidence in the record to contradict or diminish the reasonableness of the officer's belief that the object was a gun barrel, and that the barrel was contraband.

The fact that the weapon was in two pieces when found is immaterial considering that only a minimum of effort was required to make it operable. *United States v. Catanzaro,* 368 F.Supp. 450 (D.C.Conn.1973). The officer demonstrated at trial the ease with which the weapon could be connected. 26 U.S.C. § 5861(d) provides in pertinent

part that it is unlawful "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record," and 26 U.S.C.A. § 5845(a) states that "firearm" as used in the Act includes "shotgun having a barrel or barrels of less than 18 inches in length." Title 26 U.S.C.A. § 5845(d) defines shotgun as follows:

> The term 'shotgun' means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of projectiles (ball shot) or a single projectile for each pull of the trigger, *and shall include any such weapon which may be readily restored to fire a fixed shotgun shell.* (Emphasis added.)

Section 5845(d) does not specify that the parts must be assembled before it applies. The firearm in question was capable of being "readily restored to fire a fixed shotgun shell," and to reason otherwise would be to frustrate or defeat the very purpose of the statute. Thus, the plain view determination will ratify the seizure of the shotgun and its admissibility as evidence if the officers had a right to be in appellant's residence.[7]

The record reveals that the officers initially went to appellant's residence in order to execute a warrant for appellant's arrest. Although it strains our imagination to think the front door "sprang open" by itself, the law recognizes that an entry to execute an arrest warrant is an exception to the requirement of a search warrant to intrude into a home. *United States v. Cravero,* 545 F.2d 406, 421 (5th Cir. 1976); *United States v. James, supra,* 528 F.2d at 1017; *Rodriguez v. Jones, 473 F.2d 599, 605–06 (5th Cir. 1973),* cert. denied, 412 U.S. 953, 93 S.Ct. 3023, 37 L.Ed.2d 1007. Confirming this as the law of the Fifth Circuit, this Court in *Cravero* noted:

The test is properly framed in terms of reasonable belief. Probable cause is essentially a concept of reasonableness, but it has become a term of art in that it must always be determined by a magistrate unless exigent circumstances excuse a warrant. . . . Reasonable belief embodies the same standards of reasonableness but allows the officer, who has already been to the magistrate to secure an arrest warrant, to determine that the suspect is probably within certain premises without an additional trip to the magistrate and without exigent circumstances. . . . The reasonableness of the officer's judgment is always subject to judicial review, of course. [Citations and footnote omitted]. 545 F.2d at 421.

In *Rodriguez, supra,* this Court quoted the Restatement, Second, Torts § 204 when stating:

> "The privilege to make an arrest for a criminal offense carries with it the privilege to enter land in the possession of another for the purpose of making such an arrest, if the person sought to be arrested is on the land or if the actor reasonably believes him to be there." 473 F.2d at 605–06.

Although there is no indication in the record that the officers had reason to know whether appellant would be at his home when they went there to execute the arrest warrant, we find it a reasonable anticipation on the officers' part to believe that a person would be at his place of abode, especially at 8:30 in the morning for a man not known to be working (the officers were not aware that appellant worked until Brenda Jones told them). The fact that the person sought was not in the house did not render the entry invalid nor require suppression of the evidence seized while in plain view. *United States v. James, supra,* 528 F.2d at 1017, citing *United States v. Hofman,* 488 F.2d 287 (5th Cir. 1974).

We recognize that *Cravero, James* and *Rogriguez* concerned officers entering the property of a third party in an effort to

---

7. Whether or not the receiver portion was also in plain view would not have altered the

judge's determination. See the trial court's statement denying motion, quoted in text.

execute an arrest warrant for a person believed to be on that property. In contrast, the instant case involves officers entering the property of the subject of the arrest warrant. We do not see any cause for a distinction, however, and, if anything, the intrusion onto a third party's property would seem to be a more possible Fourth Amendment infringement. We of course are referring here to the right of officers to enter a house in an attempt to satisfy an arrest warrant; we are not sanctioning an unlimited, general exploratory search of premises. Nevertheless, some search might be necessary: "While the ultimate objective of an arrest entry is an arrest, the arrest can only be effected if the subject is first found and thus a search is a necessary factual prerequisite to the possible arrest." 545 F.2d at 416. A limited search incidental to an arrest is also permissible. *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *United States v. Edwards*, 554 F.2d 1331 (5th Cir. 1977). Except within these parameters, however, the arrest warrant may not substitute for a search warrant.

■ Once the officers were legally inside the residence, they asked Brenda Jones to show them to appellant. She led them to the back bedroom and then the bathroom, although as we now know he wasn't there. It appears from the record that the officers then continued looking in various rooms. There is no evidence that Brenda Jones at any time asked them to leave or that she felt coerced or intimidated in any way. The actions of Brenda Jones impliedly if not actually indicated her voluntary consent to the search of the house,[8] including the room in which the cabinet was located. The extent of the "search" was primarily

walking through the house to look for appellant; it was not intended to uncover any evidence of criminal violations. Inadvertently the officer discovered the sawed-off shotgun which was plainly visible to him as he walked through the room.

■ After the officers discovered the shotgun, they called a detective to remain at the house while they and Brenda Jones went to the bakery looking for appellant. Detective Tom Swight arrived at the house before the officers left with Ms. Jones, and he remained inside the house until they returned.[9] The record does not indicate precisely how long the officers were gone, but it is clear that they drove directly to the bakery and, not finding appellant, returned directly to his residence. Upon their return the officers seized the shotgun.

Thus from the relatively brief time the officers first entered appellant's house through the time of the seizure, the shotgun was under the continuous custody and observation of police authority present inside the dwelling. Under these particular circumstances, the plain view sighting of the shotgun and its seizure fell within the legitimate scope of a single brief intrusion into appellant's home, an intrusion justified in order to execute the arrest warrant. We are thus not confronted with a situation in which police leave a house and must justify a subsequent, separate warrantless entry. We decline to forecast our opinion on a delayed plain view reaction of several hours or days, and leave that situation for when it presents itself.

Having concluded that the trial court did not err in finding the shotgun was in plain view, and further that the officers had a right to be where they were when they

---

**8.** Consent, freely and voluntarily given, justifies a warrantless search. See *United States v. Horton*, 488 F.2d 374, 381 (5th Cir. 1973), and cases cited therein. While the record is not clear as to whether Brenda Jones jointly owned the house that was searched, it is clear that she was living there at the time and therefore could authorize the search. *Frazier v. Cupp*, 394 U.S. 731, 740, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).

**9.** The record does not clearly establish that the officers took Ms. Jones along on their trip to the bakery or that the detective was continuously in the house from the time the officers left through their return, but defense counsel does not dispute these facts, which were not at issue as the suppression motion was formulated. In response to a direct question at oral argument, appellate counsel after conferring with trial counsel conceded that this account of the events was accurate.

observed the shotgun in plain view, we affirm the denial of appellant's motion to suppress.

AFFIRMED.

GOLDBERG, Circuit Judge, dissenting:

I respectfully dissent. My disagreement relates to the seizure of the receiver portion of the gun from the cabinet below which the barrel was discovered. The majority's approval of this seizure means one of two things. The majority may have concluded that the cabinet door was open. While that fact would bring the discovery of the stock within the protection of the plain view doctrine, the district court expressly declined to resolve the evidentiary dispute regarding the cabinet door and acted on the assumption that the door had been closed. The contrary certainly does not so leap from the cold record as to merit appellate fact-finding.

Alternatively, as its opinion occasionally suggests, the majority may feel that the seizure from the cabinet was justified notwithstanding that it was closed. If this be the theory, I must vigorously disagree. Approval of the seizure of the receiver portion of the gun from a closed cabinet would signify that a plain view sighting of evidence legitimates a subsequent warrantless search of private places for other evidence one would necessarily expect to be in the proximity of that first sighted. At least where no exigency compels the subsequent exploration, and I can find none here, such a proposition is wholly unsupported and unsupportable.

I.

The starting point for analysis of appellant's claims should not require repeating:

It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause 'is *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'

*Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), *quoting Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). *See also United States v. United States District Court for Eastern District of Michigan,* 407 U.S. 297, 314–18, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); *Vale v. Louisiana,* 399 U.S. 30, 34, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); *Chimel v. California,* 395 U.S. 752, 760–62, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn.L.Rev. 349, 358 (1974).

The officers here acted without a warrant. Thus the initial entry of appellant's residence, as well as the sightings of the gun barrel and the receiver, must each be justified by reference to an exception to the warrant requirement.

I agree that the officers' initial entry of appellant's home in order to execute the warrant for his arrest was lawful. A reasonable belief that appellant was inside the dwelling was of course a prerequisite to lawful entry. As the majority carefully notes, the police could reasonably expect appellant, whom they had no cause to believe was employed, to be at his home at 8:30 a. m. on a week day.

Moreover, I agree that the plain view doctrine protects the sighting of the shortened gun barrel protruding from beneath the dining room cabinet. The officers discovered the barrel while passing through each room of the house; the discovery was within the legitimate scope of a search for the subject of an arrest warrant. Given the plain view justification, the issue of Brenda Jones's consent is irrelevant. Those comments in the majority opinion suggesting that she consented to portions of the search are therefore unnecessary to its holding.

I must add, however, that any suggestion of consent is unfounded. The district court made no such finding, and the record could not support one. Accepting the testimony offered by the government, the officers had entered and proceeded with their search to the center of the house before meeting Ms. Jones. The officers announced that they were in the house for the purpose of serv-

ing the warrant on appellant. In such circumstances, and certainly where the issue of consent is as undeveloped as it is in this record, the language of *Bumper v. North Carolina*, 391 U.S. 543, 550, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968), governs:

> When a law enforcement officer claims authority to search a home under a warrant he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there can be no consent.

Accordingly, while I agree that the discovery of the gun barrel was proper under the plain view doctrine on which the majority chiefly relies, I reject the suggestions that Ms. Jones may have consented to portions of the search. I repeat that those suggestions are unnecessary to the court's holding.

## II.

My concurrence with the majority must regrettably terminate with the plain view discovery of the gun barrel.

After discovering that barrel on the floor, the officer located the remainder of the gun in a cabinet above. The district court did not attempt to resolve the conflict in the testimony regarding whether the cabinet was open. Rather, the court below assumed that it was closed but opined that the discovery of the barrel justified opening the cabinet to search for the remainder.

This court's opinion is distressingly silent on this issue. While the majority quotes that portion of the district court's denial of the suppression motion in which it expressly assumed the cabinet door had been closed, *ante* at 663, the majority also mentions a finding "that the *shotgun* was in plain view" (emphasis added). *Ante*, at 663. To the extent this implies a finding that the cabinet that contained the receiver portion was open, it overstates the district court. Moreover, there is no basis for appellate resolution from the cold record of the square conflict in government and defense testimony on this issue. If the majority has indulged in the factual assumption that the cabinet was open, its conclusion that the discovery of the stock was within the officer's plain view is legally sound. Such a factual assumption, however, would be error.

The majority may indeed have accepted the assumption that the cabinet was closed, but joined the district court's opinion that searching it was constitutional. If so, it offers no explanation for its apparent belief that the plain view sighting of the barrel permitted a warrantless search of a closed cabinet for the receiver. Nor does it offer any limitations on the "search for related evidence" rationale that such a holding would imply.

The question may be simply put: which of the few, narrow exceptions to the fourth amendment's warrant requirement justified the officer's opening the dining room cabinet? Discovery of the gun barrel admittedly provided probable cause to believe that the remainder of the gun lay somewhere nearby. Yet probable cause to believe that contraband is in a particular place protected by the fourth amendment is never sufficient standing alone to excuse the warrant requirement.

The plain view doctrine cannot save the search of the cabinet. Retrieving the gun barrel from beneath the cabinet did not cause the door to open. Under the facts assumed by court, the officer had to open a closed cabinet to discover the receiver. Probable cause, even certain knowledge, that contraband lies behind closed doors does not endow a law enforcement official with x-ray vision. The discovery of the gun barrel did not provide the officer with "plain view", literally or legally, of the receiver within the cabinet. Upon delving into closed cabinets, the peripatetics of the officers assumed a license that the fourth amendment does not tolerate. The search was kaleidoscopic, not microscopic. The object was unseen and not even unplainly viewed.

Nor were exigent circumstances present to justify the cabinet search. Without the barrel the gun was inoperable. Moreover,

the police had no particular reason to fear concealment or disposal of the rest of the gun. When they left the house to search further for appellant, the officers left the gun under a detective's surveillance. The risk that appellant might have managed to enter the house and remove the gun from the scene without observation is far too speculative to constitute exigent circumstances sufficient to justify a warrantless search, if the warrant requirement is not to be stripped of all meaning. Search warrants may be on their way to obsolescence, with "exigent circumstances" fast becoming little more than an empty incantation in the lexicon of fourth amendment cases. Yet whatever tomorrow's chapter in the erosion of liberty and cherished rights, today a warrant or truly exigent circumstances is still compulsory.

No other exception to the warrant requirements seems even remotely applicable, and the majority offers none.[1] Perhaps both the district court and the majority here may feel constrained to uphold the cabinet search because of its proximity to the gun barrel in time and place. Neither measure, however, provides a qualitative or intelligible quantitative basis for limiting the type of search approved today. What is to distinguish today's case from one in which the first cabinet does not yield the rest of the gun, so the search continues to the chest of drawers or the desk in the bedroom upstairs? Surely the majority would recognize such a warrantless search to be unconstitutional. Nonetheless, the uncertain implications of its apparent holding are troubling.

The plain view doctrine permits law enforcement officers the full use of their eyes in places the officers have a right to be. The difficulty with today's decision is that the discovery of the gun barrel never gave the officers at appellant's home a "right to be" inside the cabinet. Just as probable cause to believe an unregistered gun inside

the house could not alone have justified a warrantless entry of the home and a search through cabinets and closets, so the officer's reasonable belief upon discovery of the barrel that the remainder of the weapon lay nearby provided no basis for a warrantless search of areas of the house not within the officer's plain view. The officer who stands warrantless before a closed cabinet occupies the same legal position as one who remains outside a home. However certain his knowledge of contraband within, he may search only upon a magistrate's authorization or in response to exigent circumstances. Here there was neither. No other established exception to the warrant requirement protected the search of the cabinet. The majority has articulated no reason for a new exception, nor have I found one. Without plain view or any other exception, we have a fourth amendment violation. Suppression of the stock is the only tenable result.

I respectfully dissent.

---

1. The majority does cite *United States v. Catanzaro*, 368 F.Supp. 450 (D.Conn.1973), for the proposition that the fact that the gun was in two pieces did not remove it from the statutory definition of a shotgun. With that proposition no one could quarrel; to the extent it is intended to justify the closed cabinet search for the second part of the gun, however, the case is inapposite.